**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. |
| | § | 4:26-cv-7450 |
| v. | § | |
| | § | |
| MICHAEL NERET, M.D., | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT**

The United States of America (the "United States" or the "Government"), on behalf of the United States Department of Health and Human Services ("HHS"), brings this action under the False Claims Act, 31 U.S.C. § 3729, *et seq*. (the "FCA") to recover treble damages and civil penalties from false claims that Defendant Michael Neret, M.D. ("Dr. Neret") knowingly presented and caused to be presented to the Medicare Program ("Medicare"), including Medicare Part B ("Medicare Part B") and the Medicare Advantage Program under Medicare Part C ("Medicare Advantage"), and to recover damages under the common law theories of fraud, unjust enrichment, and payment by mistake.

**INTRODUCTION**

1. Dr. Neret knowingly presented and caused to be presented false and fraudulent claims to Medicare under Medicare Part B and Medicare Advantage by billing for a non-covered, electro-acupuncture device as though it was a covered, surgically implanted neurostimulator.

2. Dr. Neret sought reimbursement and was paid amounts totaling thousands of dollars per claim for using a device that was not reimbursable by Medicare.

3. Dr. Neret submitted or caused the submissions of more than 76 such fraudulent claims, resulting in over $976,433.33 in amounts billed to Medicare Part B and Medicare Advantage and over $499,642.41 in improper payments from Medicare Part B and Medicare Advantage that would not have been made but for Dr. Neret's fraudulent conduct.

**JURISDICTION AND VENUE**

4. This action arises under the FCA, 31 U.S.C. §§ 3729, *et seq.* and the common law.

5. This Court has subject matter jurisdiction over the entire action, including the common law claims, under 28 U.S.C. § 1345 because the United States is the plaintiff. Additionally, this Court has subject matter jurisdiction over the FCA causes of action under 28 U.S.C. § 1331.

6. This Court has personal jurisdiction over Dr. Neret under 31 U.S.C. § 3732(a) because Dr. Neret resides and/or transacts business in the Southern District of Texas.

7. Venue is proper in the Southern District of Texas under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because Dr. Neret resides and conducts business in this district and most of the events giving rise to these claims occurred in this district.

**PARTIES**

8. The United States brings this action on behalf of HHS and HHS's component

agency, the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare Program. 41 U.S.C. § 1395, *et seq*.

9. Medicare Part B and Medicare Advantage are both federal healthcare benefit programs as defined in 42 U.S.C. § 1320a-7b(f).

10. Defendant Michael Neret, M.D. is a resident of the State of Texas and a primary care physician who practices in Bay City, Texas and Lake Jackson, Texas.

11. At all times relevant to this Complaint, Dr. Neret billed Medicare Part B and Medicare Advantage through his individual National Provider Identifier ("NPI").

## LEGAL AND REGULATORY BACKGROUND

### A. The False Claims Act

12. The FCA prohibits knowingly presenting, or causing to be presented, to the Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1) (1986), and 31 U.S.C. § 3729(a)(1)(A) (2009).

13. Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

14. The FCA further prohibits knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money back to the Government. *Id.* § 3729(a)(1)(G).

15. For purposes of the FCA, the term "knowingly" means that a person, with respect to information (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the

truth or falsity of the information. *Id*. § 3729(b). No proof of specific intent to defraud the federal government is required to show that a person acted knowingly under the FCA. *Id*.

16. The FCA defines "material" to mean "having a natural tendency to influence or be capable of influencing, the payment or receipt of money or property." *Id*. § 3729(b)(4).

17. FCA violations subject the defendant to civil liability including mandatory civil penalties per false claim, plus three times (treble) the amount of damages that the Government sustains as a result of the defendant's actions. *Id.* § 3729(a).

### B. <u>Medicare Part B</u>

18. In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, through Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. § 1395, *et seq.*, commonly known as the Medicare Program. Medicare is a federal healthcare program providing benefits to persons who are age 65 years or older, have a disability, or have end-stage renal disease. *See* 42 U.S.C. §§ 426, 4426-1, 426a.

19. Medicare's implementing regulations are found at 42 C.F.R. § 405, *et seq*. Part B of Title XVIII of the Act (42 U.S.C. §§ 1395j-1395w-6) is commonly referred to as the "Medicare Part B Program" or "Part B."

20. Medicare is administered by the United States through HHS and its component agency, CMS.

21. Medicare only covers services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

22. CMS awards contracts to private insurers called Medicare Administrative Contractors ("MACs"), to administer, process, and pay Medicare Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the "Part B Trust Fund"). *Id.* § 1395u.

23. MACs act on behalf of CMS within a specified jurisdiction to process and pay Medicare claims submitted by healthcare providers and suppliers. A physician is considered a Medicare "supplier." 42 C.F.R. § 400.202. The MAC for Texas is Novitas Solutions Inc. ("Novitas"). At all times relevant to this Complaint, Novitas adjudicated and paid Medicare Part B claims submitted by Dr. Neret.

24. To submit claims to Medicare and to be paid from the Part B Trust Fund, providers and suppliers must file a CMS Form 855I, the Medicare Federal Health Provider/Supplier Enrollment Application, with the Secretary of HHS. 42 U.S.C. § 1395cc.

25. The provider/supplier enrollment application contains a certification statement in which the applicant agrees, *inter alia*, that he or she (a) will abide by Medicare laws, regulations and program instructions, (b) understands that payment of a claim is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions, and (c) will comply with all applicable conditions of participation in the Medicare program. The provider or supplier also agrees not to knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare and agrees to not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

26. On May 6, 2013, Dr. Neret personally signed and submitted a CMS Form 855I containing the foregoing certifications to the Secretary of HHS.

27. A provider or supplier enrolled in Medicare may bill Medicare Part B directly for each procedure he or she performed on a Medicare beneficiary. *See* CMS Forms 855B and 8551.

28. To bill Medicare Part B, the provider or supplier must submit a hard copy CMS-1500 Health Insurance Claim Form ("CMS-1500") and/or its electronic equivalent, known as the 837P format. 42 C.F.R. § 424.32.

29. When submitting the claim, the provider or supplier certifies the claim complies with applicable laws and regulations.

30. For a claim to be eligible for Medicare Part B payment, the claim must identify each service, supply, or equipment rendered or provided to the Medicare beneficiary.

31. After the provider or supplier submits a CMS-1500 form or its electronic equivalent to the Medicare Program, the claim is paid directly to the provider or supplier in reliance on the foregoing certifications.

32. Providers and suppliers that participate in any federal healthcare program, including Medicare, may not make false statements or misrepresentations, or cause others to make false statements or misrepresentations, of materials facts concerning payment requests. *See* 31 U.S.C. § 3729, *et seq.*

33. Furthermore, a provider or supplier must submit a Medicare Electronic Data Interchange ("EDI") enrollment application to enroll for electronic billing.

34. On July 30, 2014, Dr. Neret personally signed and submitted an EDI enrollment application.

35. At all times relevant to this Complaint, Dr. Neret electronically submitted claims for reimbursement to Medicare Part B.

36. For each electronic claim submission, Dr. Neret was required to identify the Medicare beneficiary, specify the date the services were performed, describe the services performed, and specify the charge for the services performed.

37. Dr. Neret, along with his staff and outside billing company, participated in and directed the claim submission process and caused the submission of these claims to Medicare.

**C. <u>Medicare Advantage</u>**

38. Medicare eligible beneficiaries can elect to opt out of Medicare Part B and instead receive their benefits through privately run insurance plans known as "Medicare Advantage" plans under Medicare Part C. *See* 42 U.S.C. §§ 1395w-21-1395w-28; 42 C.F.R. § 422.50(a).

39. An individual is eligible to elect a Medicare Advantage plan if he or she is "entitled to Medicare under Part A and enrolled in Part B." 42 C.F.R. § 422.50(a).

40. Today, more than half of all Medicare beneficiaries are enrolled in Medicare Advantage plans.

41. Medicare Advantage plans are operated and managed by Medicare Advantage Organizations ("MAOs") that contract with CMS. *E.g.*, 42 C.F.R. §§ 422.2, 422.503(b)(2).

42. MAOs are obligated to cover "all services that are covered by Part A and Part B of Medicare," 42 U.S.C. § 1395w-22(a)(1)(A); 42 C.F.R. § 422. 101(a), and must comply with all coverage requirements established in Medicare statutes, regulations, manuals and instructions, National Coverage Determinations ("NCD"), and Local Coverage Determinations ("LCD"). *Id.* § 422.101(b) ("MA organizations must … comply with ... (1) CMS's national coverage decisions; (2) general coverage guidelines included in original Medicare manuals and instructions; and (3) written coverage decisions of local Medicare contractors with jurisdiction for claims in the geographic area in which services are covered....").

43. Under Medicare Advantage, when a healthcare provider furnishes services to a Medicare beneficiary, the provider submits information from the patient encounter to the MAO that operates the beneficiary's Medicare Advantage plan. The provider then receives payment from the MAO instead of CMS.

44. To compensate MAOs for providing coverage, CMS makes monthly payments to the MAOs in a capitated (*i.e.*, fixed) amount, per beneficiary enrolled in each Medicare Advantage plan.

**D. <u>Medicare's Medical Necessity Requirements and Coding Processes</u>**

45. Medicare reimburses only those services that are "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A).

46. In submitting claims to Medicare, providers and suppliers must certify that the information on the claim form accurately describes the services rendered and that the

services were reasonably and medically necessary for the patient, 42 U.S.C. §1395y(a)(1)(A).

47. Providers and suppliers must also certify that the services they furnish meet professionally recognized standards of care. 42 U.S.C. § 1320c-5(a)(2).

48. For a claim to be eligible for Medicare Part B payment, the claim must identify each service, supply, or equipment rendered or provided to the patient. Medicare requires the provider to use standardized numerical procedure codes, known as Healthcare Common Procedure Coding System ("HCPCS") codes, that identify the items and services rendered and for which payment is sought. 45 C.F.R. §§ 162.1002(a)-(b); Medicare Claims Processing Manual, Ch. 23 § 20.7, *et seq.*

49. Medicare Advantage plans must process and pay claims consistent with Medicare standards, identifying the same data elements as Medicare Part B and utilizing HCPCS codes. 42 U.S.C. § 1395w-24; 42 C.F.R. § 422.504(a)

50. CMS and its contractors, including MAOs, deny payment to providers who bill for HCPCS codes when the criteria for those codes are not met, such as when the services are not medically necessary.

51. CMS and its contractors have issued directives concerning what is—or is not—medically reasonable and necessary and, therefore, billable. At the highest level, CMS promulgates NCDs, which are CMS's national determinations of application "granting, limiting or excluding Medicare coverage for a specific medical [item] or service." 68 Fed. Reg. 55634 at 55635; *see also* 42 C.F.R. § 405.1060 (stating that the

promulgation of an NCD "is a determination by the Secretary of whether a particular item or service is covered nationally under Medicare").

52. MACs, such as Novitas, also issue guidance documents called LCDs or Local Coverage Articles ("LCA"), defining coverage criteria and limitations and providing coding guidelines for the MACs' particular regions. LCDs are binding on MAOs' coverage determinations, whereas LCAs are considered instructional on MAOs' coverage determinations. 42 C.F.R. 422.101(b)(1).

**E. <u>NCD § 160.7</u>**

53. An NCD is binding on all private Medicare contractors, including MACs and MAOs' coverage and payment determinations. 42 C.F.R. § 422.101(b)(1).

54. The statute provides that "no payment may be made ... for any expenses incurred for items … [which] are not reasonable and necessary for the diagnosis of illness or injury." 42 U.S.C. § 1395y(a)(l)(A).

55. In NCD § 160.7, CMS established coverage and payment criteria for two classifications of electrical nerve stimulators: (A) Implanted Peripheral Nerve Stimulators; and (B) Central Nervous System Stimulators (Dorsal Column and Depth Brain Stimulators). *See* NCD § 160.7 (NCD for Electrical Nerve Stimulators) (effective August 7, 1995).

56. For "Implanted Peripheral Nerve Stimulators," CMS provided as follows:

> Payment may be made under the prosthetic device benefit for implanted peripheral nerve stimulators. Use of this stimulator involves implantation of electrodes around a selected peripheral nerve. The stimulating electrode is connected by an

> insulated lead to a receiver unit which is implanted under the skin at a depth not greater than 1/2 inch.
>
> Stimulation is induced by a generator connected to an antenna unit which is attached to the skin surface over the receiver unit. ***Implantation of electrodes requires surgery and usually necessitates an operating room.***
>
> **NOTE**: Peripheral nerve stimulators may also be employed to assess a patient's suitability for continued treatment with an electric nerve stimulator. As explained in § 160.7.1, such use of the stimulator is covered as part of the total diagnostic service furnished to the beneficiary rather than as a prosthesis.

*Id.* (emphasis added).

57. In 2006, CMS issued NCD § 160.7.1 to provide further guidance with respect to the use of Transcutaneous Electrical Nerve Stimulation ("TENS") and Percutaneous Electrical Nerve Stimulation ("PENS") when assessing a patient's candidacy for implantation of a qualified electrical nerve therapy device. *See* NCD § 160.7.1 (NCD for Assessing Patient's Suitability for Electrical Nerve Stimulation Therapy) (effective June 19, 2006). "Transcutaneous" means passing, entering, or being administered through the unbroken skin. "Percutaneous" is a medical term that means passing or performing something through the skin.

58. In NCD § 160.7.1, CMS provided that "[e]lectrical nerve stimulation is an accepted modality [service] for assessing a patient's suitability for ongoing treatment with a transcutaneous or an implanted nerve stimulator." *Id.* The suitability assessment or diagnostic can be made using a TENS unit or a PENS and is covered when performed by a physician or incident to a physician's service. *Id.* (emphasis added).

59. In NCD § 160.7.1, CMS identified the use of PENS as an appropriate

diagnostic procedure when properly used for the purpose of assessing a patient's suitability for implantation of a qualified electrical nerve stimulator device. *Id*. CMS explained:

> This diagnostic procedure which involves stimulation of peripheral nerves by a needle electrode inserted through the skin is performed only in a physician's office, clinic, or hospital outpatient department. Therefore, it is covered only when performed by a physician or incident to physician's service. If pain is effectively controlled by percutaneous stimulation, implantation of electrodes is warranted.

*Id.* CMS further stated that PENS are intended to be used on a trial basis, typically for one month, to determine whether an actual implanted nerve stimulator would provide therapeutic benefits. *Id.* CMS noted that if successful, "it is expected that a stimulator will be implanted." *Id.*

60. Through NCD § 160.7.1, CMS did *not* establish that a TENS or PENS unit is a type of implanted nerve stimulator that is covered under NCD § 160.7. Rather, it is described as a "modality" or a "diagnostic service" that is "performed" by a physician or incident to a physician's service. *Id.* As CMS explains in NCD § 160.7, "the use of the [peripheral nerve] stimulator is covered as part of the total diagnostic service furnished to the beneficiary rather than as a prosthesis." NCD § 160.7.

61. Neither NCD § 160.7 nor § 160.7.1 identify PENS or TENS devices used for this purpose as a "trial implantable neurostimulator device" or establish coverage as if a PENS or TENS was a qualified implantable neurostimulator.

62. NCD § 160.7.1 clarified that in-office treatments would ***not*** be reimbursable as PENS or TENS, much less for codes relating to "implantable" devices: "Electrical nerve stimulation treatments furnished ***by a physician in his/her office***, by a physical therapist

***or outpatient clinic*** are excluded from coverage by § 1862 of [the Medicare Act].” *Id.* (emphasis added).

**F. HCPCS Level II code L8679 (implantable neurostimulator, pulse generator, any type) and CPT code 64555 (insertion of peripheral nerve neurostimulator electrode through skin)**

63. Under the Health Insurance Portability and Accountability Act of 1996 (“HIPAA”), 45 C.F.R. § 162.1002, *et seq.*, a HCPCS Level I code is comprised of Current Procedural Terminology (“CPT”) and describes the clinical services and procedures performed by healthcare providers, whereas a HCPCS Level II code identifies non-healthcare provider items, supplies, products, and equipment.

64. HCPCS Level II code L8679 is the billing code for an “implantable neurostimulator, pulse generator, any type.”

65. CPT code 64555 is the billing code for the associated surgical implantation procedure.

66. The billing of HCPCS code L8679 and CPT 64555 together represents that the provider or supplier performed an invasive surgical procedure involving an incision in the patient’s back and the placement of leads (medical wires) into the epidural space of the spinal cord to deliver neurostimulation. NCD § 160.7.

67. Coverage and payment for CPT code 64555 is conditioned on the procedure being performed in a surgical center. *Id.* Therefore, when the services are billed in an outpatient center, HCPCS Level II code L8679 is non-payable.

68. On August 11, 2016, Novitas issued an LCA, stating:

> "It has come to Novitas' attention that auricular peripheral nerve stimulation has been billed to Medicare using the CPT code 64555. CPT code 64555 is described as: Percutaneous implantation of Neurostimulator electrode array; peripheral nerve (excludes sacral nerve).
>
> [. . . ]
>
> The following devices are listed under the Food and Drug Administration (FDA) approval documents as electro-acupuncture devices used for stimulation of auricular acupuncture points ***and as such are non-covered by Medicare in that Acupuncture is not a covered Medicare benefit***:
>
> - NeuroStim system/NSS
> - P-stim
> - ANSiStim
> - E-Pulse"

Local Coverage Article A55240, Billing and Coding: Auricular Peripheral Nerve Stimulation (Electro-Acupuncture Device) (emphasis added).

69. CMS and Novitas issued guidance on August 11, 2016 and January 29, 2020, stating Medicare did not cover electro-acupuncture devices and providers and suppliers should not bill electro-acupuncture devices under HCPCS code L8679. *See* Novitas Solutions Inc., *Local Coverage Article A55240, Billing and Coding: Auricular Peripheral Nerve Stimulation (Electro-Acupuncture Device* (2016); Medicare Learning Network, *Incorrect Billing of HCPCS L8679 – Implantable Neurostimulator, Pulse Generator, Any Type* (2020).

70. On January 29, 2020, CMS published a Medicare Learning Network ("MLN") article titled "Incorrect Billing of HCPCS L8679 - Implantable Neurostimulator, Pulse Generator, Any Type." Specifically, the article provided the following:

## PROVIDER ACTION NEEDED

The Centers for Medicare & Medicaid Services (CMS) is aware that some providers are submitting claims incorrectly to Medicare using HCPCS code L8679. This article reminds providers of Medicare policy regarding these devices. Make sure your billing staff are aware of the correct policy.

## BACKGROUND

Electro-acupuncture devices, including but not limited to P-STIM® devices, are applied behind the ear using an adhesive and/or with needles inserted into the patient's ear (similar to acupuncture). Providers are inappropriately coding electro-acupuncture devices as implantable neurostimulators (HCPCS L8679 - implantable neurostimulator, pulse generator, any type), which are Medicare-covered devices that require surgical implantation into the central nervous system or targeted peripheral nerve, and are usually implanted via procedures performed in operating rooms (see CMS Publication 100-03, National Coverage Determination (NCD) Manual, Section 160.7). While both devices can be used to treat chronic pain, the electro-acupuncture devices are non-invasive (that is, do not require surgical implantation and/or an incision), and have an external battery source. Electro-acupuncture devices and implantable neurostimulators are two separate devices, and coding electro-acupuncture devices as implantable neurostimulators is incorrect. Also, HCPCS L8679, when appropriately billed for an implantable neurostimulator pulse generator, should be submitted with the appropriate HCPCS/CPT surgical procedural code, as listed in the table below.

### Coding Guidelines

Do not report HCPCS code L8679 for the electro-acupuncture device(s). HCPCS code L8679 does not describe devices used for stimulation of acupuncture points.

Available online at: https://www.cms.gov/sites/default/files/2020-01/se20001.pdf (last accessed on August 29, 2026).

71. Suppliers or providers typically bill HCPCS code L8679 at around $8,000 to $10,000. After adjustments, CMS typically reimburses suppliers and providers approximately $6,300 to $6,500 per submission under Medicare Part B. MAOs under Medicare Advantage typically reimburse providers approximately $4,340 to $8,437 per submission.

72. Suppliers or providers typically bill CPT code 64555 at around $1,500 to $2,400. After adjustments, CMS under Medicare Part B typically reimburses providers approximately $1,200 to $1,737 per submission. MAOs under Medicare Advantage typically reimburse providers approximately $1,023 to $2,268 per submission.

73. These high reimbursement rates show that a true "implantable" device is expensive, and the implantation of such a device involves surgery.

## FACTUAL ALLEGATIONS

### A. Dr. Neret Entered into a Neuro-Stimulation Services Agreement with Emerging Solutions for the Purchase of Electro-Acupuncture Devices

74. On May 4, 2020, Dr. Neret executed a Neuro-Stimulation Services Agreement with Master Equity Texas Limited Partnership d/b/a Emerging Solutions ("Emerging Solutions") relating to the purchase of "Neuro-Stim" devices and the billing of "Neuro-Stim" services.

75. Under the Neuro-Stimulation Services Agreement, Dr. Neret contracted to buy "Neuro-Stim" devices from Emerging Solutions for $24,500 per 10-pack as well as a one-time Programming Test Unit ("PTU") for $2,150 to program the purchased devices.

76. The "Neuro-Stim" devices and the PTU Dr. Neret contracted to buy and use were ANSiStim devices, which are electro-acupuncture devices used for stimulation of auricular acupuncture points. These devices apply electric shock to patients' ears, known as electro-acupuncture.

77. On the following dates, Dr. Neret purchased 10-packs of ANSiStim electroacupuncture devices from Emerging Solutions:

| **Date of Purchase Order from Emerging Solutions** | **Amount Payable** |
|---|---|
| August 31, 2020 | $ 24,500.00 |
| September 30, 2020 | $ 24,500.00 |
| September 30, 2020 | $ 24,500.00 |
| January 31, 2021 | $ 24,500.00 |
| March 10, 2021 | $ 24,500.00 |
| April 9, 2021 | $ 24,500.00 |
| October 18, 2021 | $ 25,000.00 |
| **TOTAL** | $ 172,000.00 |

78. Notably, Emerging Solutions never billed Dr. Neret for the PTU as required under the Neuro-Stimulation Services Agreement.

79. Furthermore, the Neuro-Stimulation Billing and Management Agreement (attached to the Neuro-Stimulation Services Agreement) provided that Emerging Solutions was responsible for processing and submitting Dr. Neret's claims to third-party payers, such as Medicare Part B and Medicare Advantage.

80. Moreover, under the Neuro-Stimulation Billing and Management Agreement, Dr. Neret was responsible for ensuring that procedures were rendered and/or supervised by physicians, for certifying medical necessity, and for selecting the principal diagnosis and procedures codes.

81. Also, Dr. Neret was responsible for furnishing Emerging Solutions with access to his payer portals, which he did on September 23, 2020, when he updated his EDI enrollment to authorize Emerging Solutions to bill Medicare Part B and Medicare Advantage on his behalf.

## B. Dr. Neret Falsely Submitted Claims for Electro-Acupuncture Using an HCPCS Code for "Implantable" Neurostimulators

82. Dr. Neret submitted and caused the submission of false claims to Medicare Part B and Medicare Advantage by billing for the use of electro-acupuncture devices and obtaining hundreds of thousands of dollars in improper reimbursements.

83. This billing was false for three reasons. *First*, Dr. Neret billed HCPCS code L8679, designated for "implantable" devices, when nothing was implanted into patients and surgery was not performed. *Second*, Dr. Neret billed CPT code 64555 for an ineligible device. *Third*, Medicare covers electro-acupuncture devices in limited circumstances under which Dr. Neret did not qualify.

### *i. HCPCS code L8679 is restricted to the use of "implantable" devices and does not cover electro-acupuncture devices*

84. For decades, CMS has defined what constitutes an implantable nerve stimulator. *See* NCD § 160.7.

85. By contrast, the electro-acupuncture devices Dr. Neret used came nowhere close to resembling genuine "implantable" neurostimulators.

86. In fact, the devices Dr. Neret used "allow[] medical providers to treat chronic pain patients prior to utilization of an implanted, *permanent* device."

87. The electro-acupuncture devices Dr. Neret used resemble a hearing aid and do not require "implantation," which was confirmed by documents Dr. Neret provided.






88. Instead, the electro-acupuncture device merely required Dr. Neret to tape the device to a patient's skin and affix three small electrodes into a patient's ear.

89. Dr. Neret's documents confirmed this "procedure takes less than 15 minutes to perform," and no anesthesia or surgery of any kind was required.

90. Furthermore, according to Dr. Neret's own records, "the device [was] placed on the patient, the device is typically worn for 10-12 consecutive days without interruption … Patient return[ed]s to the office after the treatment period to have the device removed." Moreover, "[i]t [should be] stressed to the patient that it is imperative the device not come in contact with water during the treatment period. It is recommended that patient refrain from shampooing hair during treatment in order to avoid the risk of getting the device wet."

91. Witness interviews revealed that non-physician practitioners who worked at Dr. Neret's clinic applied the devices to patients.

92. Non-physician practitioners cannot independently perform surgery.

93. Medicare beneficiary interviews confirmed and corroborated the following, confirming surgery was not performed as necessitated by Medicare rules:

a. Medicare beneficiaries had the electro-acupuncture devices placed in Dr. Neret's office, not at a hospital or surgical center;

b. A non-physician practitioner placed the device;

c. The procedures took approximately 20 minutes to complete;

d. The devices were attached to beneficiaries' ears using micro-pins under the surface of the skin and secured with tape;

e. Beneficiaries were instructed that they could not get the devices wet;

f. No incision was made on their bodies and anesthesia was not used;

g. The devices fell off within a few days or were removed by the beneficiaries themselves;

h. Some could not wear both their hearing aids and the devices at the same time; and

i. The devices did nothing for their pain.

94. Similarly, Dr. Neret's medical records indicated that surgery was not performed. There were no records that patients underwent general anesthesia or any actual operations. Rather, the application of the electro-acupuncture devices to patients' ears was misleadingly described as a "procedure," and hyper-technical language was used to make it seem more complicated than in reality.

95. Emerging Solutions supplied Dr. Neret with standardized medical record templates, including a Letter of Medical Necessity for Implantation of Neurostimulator and Neurostimulator Procedure Form.

96. Dr. Neret completed these standardized medical record templates for his patients by marking the designated checkboxes. Notably, Dr. Neret's patient chart notes also reflected a verbatim copy-and-paste of this standardized form language.

EMERGING SOLUTIONS

Suggested Patient Notes

**Patient notes need to include most of the following:**

- The patient has chronic intractable neuropathic pain on the trunk and/or limbs associated with at least one of the following conditions:
  - Lumbosacral arachnoiditis as documented by high levels of protein in the cerebrospinal fluid and/or imaging (MRI)
  - Nerve Root injuries that are post-surgical or post-traumatic, including post-laminectomy syndrome (failed back syndrome)
  - Complex Regional Pain Syndrome (CPRS)
- Serve pain and disability with documented pathology or an objective basis for the pain
- Stimulation is being used as a late or last resort after documented failure of at least 6 consecutive months of physician-supervised conservative management.
- There is no evidence of existing untreated drug addiction.
- The patient has been evaluated by a pain management specialist prior to implementation.
- All the facilities, equipment, and professional and support personnel required for the proper diagnosis, treatment training, and follow-up of the patient must be available.
- At least one surgical opinion has been obtained to ensure that the patient does not have a surgically correctable lesion.
- Documentation of an evaluation by a mental health provider (e.g., a face-to-face assessment with or without psychological questionnaires and/or psychological testing) that confirms no evidence of an inadequately controlled mental health problem (e.g., alcohol or drug dependence, depression, psychosis) that would negatively impact the success of a spinal cord stimulator or contraindicate its placement.

EMERGING SOLUTIONS

**Care Plan Template: Medicare**
**Implantable Neurostimulator**
**Care Plan: No additional notes. Only state the following.**
**Medicare Implantable Neurostimulator Medical Policy Guideline 160.7.1**
**Based on the patient's history, initial examination and today's findings it is our medical teams' recommendation to proceed with an Implantable Nerve Stimulation Therapy. It is a highly effective approach for the use of chronic intractable pain. Use of this stimulator involves implantation of leads around the peripheral nerve and induced by a pulse generator. The leads are placed by physician via open surgical or implanted percutaneous approach. The patient is likely to derive significant therapeutic benefit from the Neurostimulator treatment. The Neurostimulator will aid in the patient's ability to participate in normal activities of daily living.**

****DO NOT INCLUDE WORDS IN CHART NOTES SUCH AS:**
- **Vagal**
- **Acupuncture**
- **Any acronyms**
- **Peripheral nerves**
- **Auricular**
- **Cancer Pain**

97. Emerging Solutions' medical record templates show the exaggeration in Dr. Neret's medical records was intentional.

*ii.* *CPT code 64555 cannot be used for electro-acupuncture devices*

98. Since 2016, Novitas has issued specific guidance stating electro-acupuncture devices, such as the ANSiStim that Dr. Neret used, would not qualify for payment under CPT code 64555. *See* LCA A55240, Billing and Coding: Auricular Peripheral Nerve Stimulation (Electro-Acupuncture Device) (2016).

99. LCA A55240 provided clear guidance that devices like the ANSiStim should not be billed to Medicare at all and were not reimbursable because they simply provided "electro-acupuncture" and "[a]cupuncture [was] not a covered Medicare benefit."

100. Dr. Neret cannot claim that he did not know this guidance existed. He was required to know Medicare guidelines for billing and coding. *See supra* ¶¶ 25-26.

*iii.* *Medicare covers electro-acupuncture devices in limited circumstances under which Dr. Neret did not qualify and are not applicable here*

101. As outlined above, the electro-acupuncture devices Dr. Neret used were not implantable and, therefore, did not qualify for reimbursement under HCPCS code L8679 and CPT 64555.

102. Dr. Neret's billing of these codes was improper because electro-acupuncture devices were only reimbursable from Medicare as acupuncture.

103. Medicare did not cover acupuncture treatments until 2020. In January of 2020, CMS began allowing limited coverage for acupuncture. NCD § 30.3.3. That limited coverage applied only where the providers were qualified with a "degree in acupuncture" and had a current state license to practice acupuncture. *Id.*

104. Medicare's acupuncture guidance does not authorize the use of separate and inapplicable codes like L8679 and 64555. *Id.*

105. Dr. Neret has never held a degree in acupuncture.

106. Dr. Neret has never held a license in any state to practice acupuncture.

107. No one on Dr. Neret's staff has ever held a degree in acupuncture.

108. No one on Dr. Neret's staff has ever held a license in any state to practice acupuncture.

**C. Dr. Neret Knew His Billing Was Improper (Or, at a Minimum, Recklessly Disregarded Whether It Was Improper)**

109. As explained above, the FCA applies whenever someone submits false claims to the federal government "knowingly." 31 U.S.C. § 3729(b). However, the FCA

does not require specific intent to defraud, and knowledge of a claim's falsity may be shown through (i) actual knowledge, (ii) deliberate ignorance, or (iii) reckless disregard. *Id.*

110. Dr. Neret's conduct demonstrates that he knew that it was improper to bill L8679 and 64555 for electro-acupuncture devices when he submitted claims to Medicare. At a minimum, he recklessly disregarded countless red flags so that he could receive as much money as possible.

111. Dr. Neret could not reasonably view p-stim devices as "implantable" or expect them to legitimately earn over $6,000 in reimbursement from Medicare.

112. On its face, the plain language of the billing requirements of L8679 under NCD § 160.7 is clear. The code applies to implantable neurostimulators. Medicare has reimbursed for devices under L8679 for decades, and implantable neurostimulators are recognizable devices, manufactured by well-known manufacturers. No reasonable medical provider could maintain that devices such as the ANSiStim were implantable. Indeed, the simplest of inquiries would have led Dr. Neret to NCD 160.7, which states that an implantable device requires surgery. *See supra* ¶ 56.

113. The electro-acupuncture devices used by Dr. Neret—the ANSiStim device—are clearly not implantable neurostimulators. The ANSiStim device utilizes a nine-volt battery, which is *taped* to patients' ears or shoulders using adhesive. The only thing that is inserted into the skin are the small electrode wires. Those electrodes were fitted in such a way that they could fall off, and indeed, the devices Dr. Neret billed to Medicare fell off while the beneficiary was in the shower or performing other similar activities.

114. The process to insert these electrodes takes just minutes and is simple enough that it was performed by nurses or other clinic staff. In fact, witness interviews revealed that Dr. Neret's office staff, including the office manager and non-physician practitioners, learned how to perform the electro-acupuncture placement procedure, confirming there was no surgical implantation.

115. Witness interviews further revealed that Dr. Neret and his staff were made aware of the frequency with which the device fell off. Patients reported the electro-acupuncture device would fall off on its own accord or was removed by the patients themselves. Additionally, patients reported the device did little to help with their pain, leading all of them to either continue or resume their pain medications.

116. Dr. Neret's former nurse practitioner said Dr. Neret presented the electro-acupuncture procedure to the office staff, and he "pushed" to utilize the procedure. Moreover, Dr. Neret never said how the electro-acupuncture procedure was going to be beneficial to the patient. In fact, Dr. Neret used the electro-acupuncture procedure to justify the continuation of prescribing narcotics. This former nurse practitioner reasoned that regardless of whether the electro-acupuncture procedure reduced pain, Dr. Neret could say he used an alternative method to treat a patient's pain. If the electro-acupuncture procedure failed, Dr. Neret could justify prescribing the patient additional or continued narcotics to treat pain.

117. Medicare beneficiaries' interviews also confirmed this observation.

118. Finally, the disparity between the cost of the electro-acupuncture devices, the amount billed to Medicare, and the reimbursements received from Medicare should have

put Dr. Neret on notice that it was improper to bill L8679 and 64555. Dr. Neret paid $2,450-$2,500 per device. By contrast, Dr. Neret billed Medicare Part B and Medicare Advantage over $13,000 for the device application, Medicare Part B reimbursed Dr. Neret over $8,000 per claim, and Medicare Advantage typically reimbursed Dr. Neret over $7,000 per claim.

119. In other words, Dr. Neret knew Medicare was paying him thousands of dollars—with a profit margin of over 300%—for just a few minutes (at most) of work, for a "surgery" that was performed by his non-physician staff.

### D. Examples of Claims Submitted by Defendants Under Codes L8679 and 64555

120. From September 8, 2020 to September 8, 2022, Dr. Neret falsely submitted Code L8679 and/or 64555 on at least 76 claims to Medicare Part B and Medicare Advantage and received at least $499,642.41 in payment.

121. An itemization of the false claims that Dr. Neret knowingly submitted or caused to be submitted to Medicare Part B and Medicare Advantage are identified and attached as **Exhibit A**, itemized by the Medicare beneficiary's initials, health insurance claim number, date(s) of service, code billed, payor, and payment amount per claim.

122. All of these claims were materially false and should not have been submitted to Medicare Part B or Medicare Advantage.

123. Dr. Neret, acting along with members of his staff and outside billing companies, including Emerging Solutions, submitted, or caused to be submitted, these false claims. As outlined in detail above, Dr. Neret selected the codes to be used and directed

that those particular codes would be submitted in connection with electro-acupuncture services.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**False Claims Act, 31 U.S.C. § 3729(a)(1)(A):**
**Causing and Presenting False Claims**

124. The United States realleges and incorporates by reference all allegations set out in all paragraphs of this Complaint.

125. From September 8, 2020 to September 8, 2022, Dr. Neret presented or caused to be presented materially false and fraudulent claims for payment or approval to the United States, including claims for payment to Medicare Part B and Medicare Advantage that were false and fraudulent because they were for services for which Medicare Part B and Medicare Advantage did not reimburse.

126. Specifically, Dr. Neret knowingly presented or caused to be presented false claims for a noncovered electro-acupuncture device under HCPCS Level II code L8679 (implantable neurostimulator, pulse generator) and/or CPT code 64555 (insertion of peripheral nerve stimulator), resulting in reimbursement to Dr. Neret, despite the fact that the services rendered to patients (a) did not qualify for HCPCS Level II code L8679 because there was no implantation of any device and did not involve surgery or the implantation of a device or a neurostimulator electrode array; (b) did not qualify for CPT code 64555 because an ineligible device was used; and (c) were otherwise not reimbursable at all because Medicare covers electro-acupuncture devices in limited circumstances under which Dr. Neret did not qualify.

127. These false claims were material to the United States' payment decisions. Had the United States known that the services Dr. Neret provided did not qualify for reimbursement, the United States would not have paid the claims.

128. Dr. Neret presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

129. Because of Dr. Neret's acts, the United States sustained damages in an amount to be determined at trial, and as a result, the United States is entitled to treble damages under the FCA plus all civil penalties authorized by law.

## SECOND CAUSE OF ACTION
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B):**
**Using False Records and Statements Material to False Claims**

130. The United States realleges and incorporates by reference all allegations set out in all paragraphs of this complaint.

131. Dr. Neret knowingly made, used, and caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. Specifically, Dr. Neret knowingly made materially false records or statements by asserting claims for Medicare payment under HCPCS Level II code L8679 and/or CPT code 64555, despite knowing that he was not performing surgery to implant neurostimulators.

132. These false records and statements also include, but are not limited to, Dr. Neret's agreements, representations, and certifications made in his Medicare provider

enrollment forms, and false and misleading representations on claim forms submitted to Medicare Part B and Medicare Advantage.

133. Dr. Neret's false certifications and representations were made for the purpose of ensuring Medicare paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Dr. Neret's statements and actions.

134. Dr. Neret made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity or with reckless disregard or deliberate ignorance of whether or not they were false.

135. The false certifications and representations made or caused to be made by Dr. Neret were material to the payment of the false claims by the United States. Had the United States known that the services Dr. Neret provided did not qualify for reimbursement, the United States would not have paid the claims.

136. Because of Dr. Neret's acts, the United States sustained damages in an amount to be determined at trial, and as a result, the United States is entitled to treble damages under the FCA plus all civil penalties authorized by law.

## THIRD CAUSE OF ACTION
## False Claims Act, 31 U.S.C. § 3729(a)(1)(G): Using False Records and Statements Material to an Obligation to Pay

137. The United States realleges and incorporates by reference all allegations set out in all paragraphs of this complaint.

138. During the relevant time period, Dr. Neret made and used or caused to be made and used false records or statements, including his Medicare Part B and Medicare Advantage enrollment agreements, material to an obligation to pay or transmit money to

the United States, or knowingly concealed, avoided, or decreased on obligation to pay or transmit money to the United States. Among other things, Dr. Neret knowingly retained and failed to repay reimbursements from Medicare for claims paid under codes L8679 and/or 64555 to which he was not entitled.

139. Dr. Neret made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false. Dr. Neret further concealed and avoided his obligation to repay money to the United States with knowledge of these obligations, or reckless disregard or deliberate ignorance of these obligations.

140. These false records and statements were material to the United States' payment decisions. Had the United States known that the services Dr. Neret provided did not qualify for reimbursement, the United States would not have paid the claims and would have sought to recoup these funds—as it is doing now.

141. Because of Dr. Neret's acts, the United States sustained damages in an amount to be determined at trial, and as a result, the United States is entitled to treble damages under the FCA plus all civil penalties authorized by law.

**FOURTH CAUSE OF ACTION**
**Common Law Fraud**

142. The United States realleges and incorporates by reference all allegations set out in all paragraphs of this intervened complaint.

143. From September 8, 2020 to September 8, 2022, Dr. Neret presented or caused to be presented, materially false and fraudulent claims for payment or approval to the

United States. Specifically, Dr. Neret submitted claims to Medicare under HCPCS Level II code L8679 and/or CPT code 64555 resulting in payment despite the fact that the services rendered to patients (a) did not qualify for HCPCS Level II code L8679 because there was no implantation of any device and did not involve surgery or the implantation of a device or a neurostimulator electrode array; (b) did not qualify for CPT code 64555 because an ineligible device was used; and (c) were otherwise not reimbursable at all because Medicare covers electro-acupuncture devices in limited circumstances under which Dr. Neret did not qualify.

144. Dr. Neret presented these claims with the intent to deceive and induce the United States into paying these claims.

145. The United States relied on the materially false representations made by Dr. Neret and took action in reliance upon those representations, including paying money to which Dr. Neret were not entitled.

146. Because of Dr. Neret's acts, the United States sustained damages in an amount to be determined at trial, and, as a result, the United States is entitled to compensatory damages consisting of the total amount paid as a result of the fraudulent claims, plus interest and other compensatory or punitive damages to be determined at trial.

## FIFTH CAUSE OF ACTION
**Payment by Mistake of Fact**

147. The United States realleges and incorporates by reference all allegations set out in all paragraphs of this complaint.

148. As a result of the conduct described above, the United States paid Dr. Neret federal funds under the Medicare Part B and Medicare Advantage programs to which he was not entitled. The United States paid Dr. Neret money for implantable neurostimulators without knowing that Dr. Neret did not actually implant any devices into patients or that Dr. Neret was performing services that were not reimbursable at all.

149. The mistaken belief of the United States was material to its decision to pay Dr. Neret.

150. The United States reasonably relied on the submission of claims made by Dr. Neret that the United States believed were accurate, complete, and truthful, in accordance with the express requirements of the Medicare Part B and Medicare Advantage Programs.

151. The United States has been damaged as a result of this mistaken payment, and Dr. Neret is thus liable to account and pay to the United States such amounts, which are to be determined at trial.

## SIXTH CAUSE OF ACTION
**Unjust Enrichment**

152. The United States realleges and incorporates by reference all allegations set out in all paragraphs of this complaint.

153. The United States claims the recovery of all Medicare monies by which Dr. Neret has been directly or indirectly enriched.

154. By retaining monies from Medicare Part B and Medicare Advantage that were intended as payment for legitimate implantable neurostimulators that were not

payable, Dr. Neret retained money that was the property of Medicare, to which he was not entitled.

155. Consequently, Dr. Neret has been unjustly enriched at the expense of the United States in an amount to be determined at trial and which, under the circumstances, in equity and good conscience, should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered as follows against Dr. Neret:

1. On the First, Second, and Third Counts under the FCA, against Dr. Neret for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

2. On the Fourth Count for common law fraud, the damages sustained by the United States plus interest, costs, expenses, and other compensatory or punitive damages to be determined at trial, together with all such further relief as may be just and proper.

3. On the Fifth Count for payment by mistake, against Dr. Neret for the damages sustained and/or amounts by which Dr. Neret was paid by mistake or by which Dr. Neret retained illegally obtained funds, plus interest, costs, and expenses, together with all such further relief as may be just and proper.

4. On the Sixth Count for unjust enrichment, against Dr. Neret for the damages sustained and/or amounts by which Dr. Neret was unjustly enriched or by which Dr. Neret retained illegally obtained funds, plus interest, costs, and expenses, together with all such

further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, the United States requests a trial by jury.

Dated: September 4, 2026

Respectfully submitted,

AARON F. REITZ
United States Attorney

By: */s/ Laura E. Collins*
LAURA E. COLLINS
Assistant United States Attorney
*Attorney-in-Charge*
Southern District Bar Number: 2827958
Texas Bar Number: 24097759

MICHELLE LUONG
Assistant United States Attorney
Southern District Bar Number: 24098021
Texas Bar Number: 3341578

1000 Louisiana, Suite 2300
Houston, Texas 77002
Phone: (713) 567-9000
Fax: (713) 718-3303
Laura.Collins@usdoj.gov
Michelle.Luong@usdoj.gov

*Counsel for the United States of America*